IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GLORIA A. FERRIS, | ) | 4:04CV3286 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| FIRST NATIONAL OF NEBRASKA | ) | |
| d/b/a FIRST NATIONAL BANK OF | ) | |
| OMAHA, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Gloria A. Ferris, who was formerly employed by the defendant, First National of Nebraska, claims (1) that she was sexually harassed and subjected to a hostile work environment because of offensive comments that were made by her male supervisor between February 2002 and March 2003, (2) that she did not receive a pay raise in January 2003 because of sex discrimination on the part of her supervisor and because she complained to upper management about the supervisor's comments in November 2002, and (3) that she was constructively discharged from her position in March 2003, denied alternative employment opportunities following such discharge, and ultimately terminated in September 2003 because she again complained to upper management in March 2003 and filed a complaint with the Nebraska Equal Opportunity Commission (also effectively filed with the federal Equal Employment Opportunity Commission) in May 2003. Suit is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17, and also the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. §§ 48-1101 to 48-1125.[1]

---

[1] Because the NFEPA is patterned after the federal act, see Father Flanagan's Boys' Home v. Agnew, 590 N.W.2d 688, 693 (Neb. 1999), I will analyze all claims by applying Title VII principles.

First National has filed a motion for summary judgment (filing 43). It argues that Ferris cannot establish a prima facie case under Title VII or the NFEPA; that she was denied a raise because of performance issues and was terminated because she refused to remain in her position, refused to accept an alternative position that was created for her, and failed to locate another suitable position at First National after being on paid leave for several months; that Ferris cannot establish that the reasons given for the adverse employment decisions were pretextual; and that Ferris did not promptly take advantage of available company procedures to put a stop the alleged sexual harassment and hostile work environment. First National also argues that it did not engage in any conduct that might entitle Ferris to an award of punitive damages under Title VII, and that an award of back pay is precluded by the amount of income she has received from new employment in Iraq.

## I. INTRODUCTION

Ferris was hired effective October 5, 1998, as a "network control operator" in First National's service delivery department in Omaha, Nebraska. She transferred to a different department on October 1, 2001, but returned to the service delivery department on February 16, 2002. When she returned, she had a new immediate supervisor, Terry Sweeney, a male. Ferris did not have much contact with Sweeney until mid-2002, however, when she was relocated to his area of the building to learn mainframe computer functions that were not previously part of her job duties.

Sweeney completed a year-end performance appraisal of Ferris in which she received an overall effectiveness rating of "developing toward expectations" (the other possible choices being "exceeds expectations," "meets expectations," and "unacceptable"). On November 21, 2002, after Ferris indicated disagreement with this assessment, she met with two of Sweeney's superiors, Joe Leykam and Doug Wells. According to both Leykam and Wells, Ferris stated during this meeting that she would like to have different job duties and that she also mentioned something about sexual comments but refused to provide any details. Ferris states that she told

2

Leykam and Wells "there was a lot of foul language going on" and also indicated to them that her appraisal was "sexually discriminatory." Ferris admits that she did not mention Sweeney by name or claim that he was sexually harassing her.[2]

Following that meeting, Leykam sent an e-mail to First National's human resources consultant, Marianne Rosenbaum, stating that Ferris had "[thrown] out innuendoes about sexual comments, however she did not have one example she would give to Doug [Wells] or me." Leykam also informed Sweeney that one of his employees had complained about sexual comments or innuendo and instructed him to make sure that it was not happening, or to report it if it was. Sweeney replied that it was not happening.

Ferris did not receive a pay raise for calendar year 2003. When she approached Leykam about the matter, Leykam reportedly told her that he was "only going by the input of [her] supervisor" in deciding that she would not receive an annual raise. First National has presented evidence that only two other employees in the service delivery department, one male and one female, did not receive raises during 2003. It is not known whether either of these employees were supervised by Sweeney.

On March 19, 2003, Ferris met with Wells and Rosenbaum and provided a written statement in which she alleged that Sweeney was subjecting her to "general harassment and sexual harassment" and gave the following examples:

1.    He does not allow me time to read my email. He has said that he
      is going to set a time limit, most of it doesn't concern me. I have
      been told to just delete it even when they are updates.

_____

[2] Ferris claims, however, that Leykam and Wells must have known that she was talking about Sweeney because only two other persons, both female, regularly worked in the mainframe computer area during this time, although three male co-workers occasionally were in the area .

2.      He has painted a picture of me of incompetence to management. He stated to me that Vicki Barry doesn't know how to do file restores, she has been doing these for over two years.

3.      He has referenced Vicki Barry and I as Twiddle Dee and Twiddle dumb.  We also have been referred to as Abbott and Costello.  I am offended by both of these derogatories.

4.      He does not allow me the opportunity to get experience in specific areas to full competency.  It has been stated that Vicki Barry and I will never be fully trained.

5.      He verbally abuses and belittles me when other coworkers are present.  One of the things he lashes out at me for is being in the room formerly known as Network Control.  He does not want me in there even during the times when I am alone watching the system.

6.      He documented all minutes I was not in the general area and then said because he didn't know where I was every minute I must have been on break all of these minutes.  My job is one where I have to leave the area during the course of the day to get tapes from across the hall or down on 2nd floor.  He did this because the previous day I said he could keep track of the time I spent on break and he would see that I do not go over the time allowed. This day was Fat Tuesday, he said if Vicki and I wanted to participate in the taste sampling of the other baked entries we would have had do this on our lunch break.  Judging of the desserts did not begin until noon, it was at this time 2:30.  It was a slow afternoon, he was making pictures of women's breasts on the pc.  I commented that why do we need to stick around here to see the pictures he's making.

7.      The workload Terry places on myself and on the other female employees in the area is substantial compared to what is required of a male coworker.

4

8.      He addresses tardiness to only the female staff.  A male co-worker arrives frequently 15 to 20 minutes past his scheduled start time. He does not have this pointed out to him nor does he enter that time on his timesheet.  This is for a morning bagel stop.

9.      Terry has made a statement that "Tits and brains do not go together".  Also, after we attended the Critical Thinking classes he said there should be a Logic class next, mandatory for all females.

10.     Specific to me, he asked on one occasion if the card reader on 2nd floor worked for me.  He said it worked for him.  I responded that I had warmed it up that's why it worked for him.  He asked if I blew on it.  I said sure.  He then said, "Did you hear that Robert, Gloria said she gave the card reader a blow job.

11.     Specific to me, recently when we were expected to get 8 inches of snow overnight I said, if we get 8 inches I'm not sure if I'll be able to make it in tomorrow morning.  My car sits really low to the ground.  He said, did you hear that Gloria said if she gets 8 inches tonight she wouldn't be able to make it in tomorrow morning.

These are only a couple of examples of the daily sexual bantering focused on me.  I have told him that this is embarrassing to me that he needs to stop.  One day he said he was trying to control but he has to bite his tongue.  Since then he has turned conversation pertaining to golf into something sexual.  Profanity is an everyday occurrence.  He has been making pictures of breasts on the pc and has also named them.  He knows this behavior is offensive to me.  He has asked me if I curse about him.  He laughs saying that someday I'm going to go ballistic on him.

(Defendant's Exhibit 8 (filing 45-9) (punctuation and grammar as in original).)

Wells and Rosenbaum state that they were unable to substantiate Ferris's allegations, but that Sweeney still was counseled that inappropriate language and conduct violated First National's workplace harassment policy and would not be

tolerated.   Sweeney stated that he understood and would not have a problem continuing to work with Ferris.   In a meeting with Wells, Rosenbaum, and Sweeney on March 20, 2003, however, Ferris stated that she could not continue to work with Sweeney (because, she testified, "he was sitting at the other end of the table with a big grin on his face, and he was continuing to lie about the comments that he had made").   Consequently, she was immediately placed on paid leave while First National's human resources department attempted to find her a new position.

No suitable existing position was found.   However, because Ferris two months earlier had posted for a LAN engineer position on First National's help desk (but was found not to be qualified), a help desk apprentice position was created for her.   The working hours for the new position during an initial training period were 8:00 a.m. to 5:00 p.m. (compared to 7:00 a.m. to 3:30 p.m. in the previous position).   Ferris requested that she be allowed to work from 7:30 a.m. to 4:30 p.m., but First National would not accommodate this request.   Ferris worked at the help desk for about two weeks before requesting another transfer, on May 7, 2003.   She was again allowed to take a paid leave of absence of unspecified duration.

On or about May 27, 2003, Ferris filed a charge with the NEOC, claiming that she was a victim of sex discrimination and retaliation because of (1) Sweeney's sexual comments, including the previously disclosed "tits and brains," "blow job," and "8 inches" comments, plus another statement allegedly made to her that "you better keep that foam, you're probably going to need it in a few years, use it and attach a string around it," (2) the lack of a pay raise, (3) an alleged statement by Rosenbaum that Ferris's employment would be terminated unless she accepted the help desk apprentice position, and (4) an alleged refusal by Wells to honor Ferris's request for different working hours at the help desk.

First National claims that it established a deadline of July 31, 2003, for Ferris to find a replacement position, which it later agreed to extend to August 31, 2003. Ferris claims that she first learned of a deadline on August 25, 2005, when she was

told she had 5 days to find a job.  Ferris also claims that she was not previously informed that it was her responsibility to apply for a new position, and complains that she could not access First National's intranet system to look for job postings.  In any event, Ferris expressed interest in three positions and it was agreed that her employment would continue while her applications were processed.  She was found not to be qualified for two of the positions, and although she was interviewed for the third position as a marketing technician, she was not hired.  Ferris's employment was terminated on September 16, 2003.

On November 26, 2003, Ferris filed a second discrimination charge with the NEOC (and EEOC), claiming retaliation because of (1) her termination and (2) the failure of the human resources department to find her a replacement position.  The NEOC issued "no reasonable cause" determinations on this filing and the earlier discrimination charge on July 16, 2004, and Ferris filed suit within 90 days thereafter, as required by the NFEPA.  Ferris also received a right to sue letter from the EEOC before commencing this action.

## II.  DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir.1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue.  Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999).  In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

7

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id. Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

Summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." Mayer v. Nextel West Corp., 318 F.3d 803, 806

(8th Cir.2003) (quoting <u>Keathley v. Ameritech Corp.</u>, 187 F.3d 915, 919 (8th Cir.1999)). Nonetheless, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of his case. <u>Simpson v. Des Moines Water Works</u>, 425 F.3d 538, 542 (8th Cir. 2005).

## A. Hostile Work Environment Sexual Harassment

"Title VII now prohibits both quid pro quo harassment, where an employee's submission to or rejection of a supervisor's unwelcome sexual advances is used as the basis for employment decisions, and hostile work environment harassment, where 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Tenge v. Phillips Modern Ag Co.</u>, 446 F.3d 903, 908 (8th Cir. 2006) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21, (1993)). Ferris does not charge her supervisor with quid pro quo harassment.

Rather, Ferris claims that her supervisor created a hostile work environment. Ferris testified that she heard Sweeney say in early 2002, after talking on the phone with Ferris's female co-worker, Vicki Barry, that "tits and brains do not go together," and that Sweeney repeated the statement after Ferris questioned what he had said; that on January 22, 2003,[3] he referred to Ferris and Barry as "Tweedledee and Tweedledum"; that on February 10, 2003, he stated that all female employees should be required to attend a logic class; that he regularly used foul language that was degrading to women (<u>e.g.</u>, bitch, cunt, whore, slut) and other profanities (<u>e.g.</u>, fuck, fucking); and that he used sexual innuendo to make jokes, including at least two involving Ferris. Sweeney announced sometime in early 2002 that Ferris had given a piece of office equipment a "blow job" to warm it up. On January 15, 2003, when

---

[3] The reason Ferris was able to provide precise dates for some incidents is that she secretly tape recorded conversations between January 15, 2003, and March 17, 2003. Ferris testified that she did this after learning there would be no pay raise.

heavy snow was forecast, Sweeney told Ferris's co-workers that she had said she would be unable to make it to work the next day if she got 8 inches that night. The "8 inches" comment became something of a running joke for the next few weeks, and Ferris even joined in the banter on January 24, 2003, by stating that she could become a nun if she didn't get 8 inches.

To establish a prima facie case of sex discrimination based on a hostile work environment, a plaintiff employee must establish that (1) she was a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment. Cottrill v. MFA, Inc., 443 F.3d 629, 636 (8th Cir. 2006). If the harassing conduct is attributable to a co-worker, the plaintiff must also show that her employer "knew or should have known of the conduct and failed to take proper remedial action." Cheshewalla v. Rand & Son Const. Co., 415 F.3d 847, 850 (8th Cir. 2005), cert. denied, 126 S.Ct. 1033 (2006). If, however, the plaintiff has been harassed by a supervisor, then the employer "is vicariously liable for the harassment unless it can establish the affirmative defense defined in Burlington Indus., Inc. v. Ellerth[, 524 U.S. 742 (1998)]." Id. First National does not dispute that Sweeney was Ferris's supervisor.[4]

"Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Nitsche v. CEO of Osage Valley Elec. Co-op., 446 F.3d 841, 845 (8th Cir. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "[The plaintiff] must clear a high threshold to demonstrate actionable harm, for 'complaints attacking the ordinary tribulations of the workplace,

---

[4] "To be considered a supervisor, 'the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties.'" Cheshewalla, 415 F.3d at 850-51 (quoting Joens v. John Morrell & Co., 354 F.3d 938, 940 (8th Cir. 2004)).

such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' obtain no remedy." Id. at 845-46 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 846 (quoting Faragher, 524 U.S. at 787). "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." Id. "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment.'" Id. (quoting Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003). "Such standards are demanding, for 'Title VII does not prohibit all verbal or physical harassment' and is not 'a general civility code for the American workplace.'" Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). "In determining whether a work environment was sufficiently hostile or abusive, [courts] examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance." Id.

While I consider Ferris's sexual harassment hostile work environment claim to be very weak,  I am also mindful that supervisors "have greater power to alter the environment" with their harassing conduct than do co-workers. See Faragher, 524 U.S. at 805.  Viewing the facts in the light most favorable to Ferris, I find that she has made out a prima facie case.

There is evidence which suggests that Ferris was not offended by Sweeney's comments nearly to the extent she claims, but Ferris testified that she told Sweeney on several occasions his sexual comments were offensive and asked him to stop. Ferris  also testified that Sweeney used vulgar and sexist language on a regular basis,

11

even though she identified only specific incident in her deposition testimony,[5] and it involved a comment that Sweeney made about his male boss, Joe Leykam (i.e., "He isn't the smartest damn cunt."). Only a few sexist remarks and crude jokes appear to have been directed at Ferris and her female co-workers, but I cannot say that a reasonable person would not find them abusive. On the other hand, there is no evidence to substantiate Ferris's written complaints (in March 2003) that female employees were subjected to heavier workloads or held to a different standard of timekeeping than male employees.

In some respects, the present case resembles Wright v. Rolette County, 417 F.3d 879 (8th Cir. 2005), cert. denied, 126 S.Ct. 1338 (2006), in which the Court of Appeals held that a prima facie case was established where a sheriff offended and embarrassed a female employee by making unwelcome comments of a sexual nature over a 2-year period (including calling the plaintiff a "big-breasted Canadian secretary," a "dizzy bitch," and "Canadian bacon" in front of others; by commenting about a "potty cam" when the plaintiff returned from the restroom; by telling the plaintiff that he could use a "blow job" after hearing her explain that she knew from police training how to knock somebody out with a single blow; by talking about "rubbing [her] tits with toilet paper" and referring to her vagina as a "snapper"; by stroking his mustache while telling the plaintiff that he was "clearing off her seat"; and by making comments about lesbian activity). It might also be compared to Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1159 (8th Cir. 1999), in which the Court of Appeals held that it was error for the district court to grant summary judgment where the evidence showed that the plaintiff's supervisor "fondled his genitals in front of her and used lewd and sexually inappropriate language." Finding no clear precedent for holding that Sweeney's actions were not severe or pervasive enough to create a hostile work environment, I next turn to First National's affirmative defense.

---

[5] The deposition was put in evidence by First National. Ferris has presented no evidence of her own in opposition to the summary judgment motion.

The Ellerth/Faragher affirmative defense protects employers in harassment cases in which an employee fails to stop the harassment by using the employer's effective anti-harassment policy.  McCurdy v. Arkansas State Police, 375 F.3d 762, 772 (8th Cir. 2004), cert. denied, 543 U.S. 1121 (2005).  The defense, which is available only when no tangible employment action been taken, "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."   Ellerth,  524 U.S. at 765; Faragher, 524 U.S. at 778.

It is undisputed that First National had a written anti-harassment policy and that Ferris received a copy of the policy when she was hired.  I also have no difficulty finding that Ferris unreasonably delayed in bringing Sweeney's alleged conduct to the attention of upper management.  She refused to provide any specific information when she complained to Leykam and Wells in November 2002 about "a lot of foul language going on" and waited until March 2003 before providing any examples of the alleged harassment.  However, the evidence does not conclusively show that the first prong of the Ellerth/Faragher affirmative defense is satisfied in this case.  The evidence shows that Wells and Rosenbaum met with Sweeney after their meeting with Ferris on March 19, 2003, and that someone may also have talked to Leykam, but no specifics are given, except that the investigation was over by the next day.  Thus, I conclude that a jury issue is presented regarding the effectiveness of the First National anti-harassment policy.

## B.  Retaliation

I also conclude that a jury must decide whether there is a causal connection between Ferris's complaints of sex discrimination and her loss of employment.  First National contends that she was terminated only because she had been on paid leave for almost six months, but the reason that she was placed on paid leave in the first

13

place was that she refused to work with Sweeney any longer. Whether her refusal was justified cannot be conclusively determined from the current record, just as it cannot be conclusively determined whether First National responded appropriately to her complaints of harassment. No adverse employment action occurs when an employee is placed on paid leave and later restored to her position, or transferred to a position that is not less desirable, see Singletary v. Missouri Dept. of Corrections, 423 F.3d 886, 891-92 (8th Cir. 2005), but there is no evidence that the help desk apprentice position was a lateral transfer (although it is known that Ferris objected to the different working hours). What transpired from the time that Ferris quit the help desk position on May 7, 2003, until she was terminated on September 16, 2003, is not at all clear to me.

To the extent Ferris claims that she did not receive a pay raise in January 2003 because she made an informal complaint of sex discrimination in November 2002, I think the evidence does not support such a claim. As discussed below, however, I think she does have a viable direct claim of sex discrimination.

## C. Sex Discrimination

First National argues that Ferris cannot establish a prima facie case of sex discrimination using the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). I agree with this assessment, because there is no evidence that she was similarly situated to a male employee who received a pay increase. However, the McDonnell Douglas analysis only applies when a plaintiff must rely upon circumstantial evidence to prove discriminatory animus. In this case, there is direct evidence that Sweeney was of the opinion that "tits and brains do not go together," and that First National's female employees should be required to take a logic class. While First National tries to insulate itself from liability by claiming that the performance appraisal conducted by Sweeney was not the sole reason that Ferris did not receive a raise, Leykam told Ferris he was "only going by the input of [Sweeney]" in denying the raise. Also, First National has not shown that the "audit"

by its human resources department effectively removed Sweeney from the decision-making process.  Under these circumstances, summary judgment is inappropriate.  See Mohr v. Dustrol, Inc., 306 F.3d 636 (8th Cir. 2002) (reversing grant of summary judgment where reasonable factfinder could conclude that plaintiff's supervisor was closely involved in the decision not to rehire plaintiff to a road crew; the supervisor's derogatory comments about the workplace capabilities of women and non-Hispanics sufficiently established the "specific link" between the challenged employment action and the alleged animus), overruled on other grounds by Desert Palace, Inc. v Costa, 539 U.S. 90 (2003).

### D.  Punitive Damages and Backpay

"Under the terms of [§ 1981a(b)(1) ], . . . punitive damages are available in claims under Title VII . . . [where] the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  Ogden v. Wax Works, Inc., 214 F.3d 999, 1008 (8th Cir. 2000) (quoting Kolstad v. American Dental Ass'n, 527 U.S. 526, 529-30 (1999)).  "This standard does not require egregious misconduct, but there must be evidence that the employer intentionally discriminated and had 'knowledge that it may be acting in violation of federal law.'"  Rowe v. Hussmann Corp., 381 F.3d 775, 783-84 (8th Cir. 2004) (quoting Kolstad, 527 U.S. at 535) (citation omitted).  "A corporation may avoid punitive damages by showing that it made good faith efforts to comply with Title VII after the discriminatory conduct."  MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 931 (8th Cir. 2004) (citing Kolstad, 527 U.S. at 545-46).  "However, where an employer discriminates in contravention of its own policies, the existence of those policies does not allow the employer to escape punitive damages."  Id.

The evidence presented by First National does not conclusively establish that it can have no liability for punitive damages.  Although Ferris has not responded to

First National's argument that her post-termination earnings exceed any potential backpay award, I will also reserve ruling on this damages issue until trial.

## III.  CONCLUSION

Because the trial of this matter is scheduled to commence on July 10, 2006, I have not discussed every issue at length.  If I have not framed the issues correctly, or if I have overlooked pertinent legal authority or facts, I trust that the parties will bring any such errors and omissions to my attention in their trial briefs.

IT IS ORDERED that Defendant's motion for summary judgment (filing 43) is denied.

June 20, 2006.                              BY THE COURT:

                                            s/ *Richard G. Kopf*
                                            United States District Judge